# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT of TENNESSEE
# at CHATTANOOGA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) <br> ) <br> **v.** ) <br> ) <br> **ROBERT R. DOGGART** ) | 1:15-cr-39 <br><br> **Judge Collier** <br> **Magistrate Judge Lee** |

### UNITED STATES' MEMORANDUM REGARDING "TRUE THREATS"

The United States of America by and through William C. Killian, United States Attorney for the Eastern District of Tennessee, Perry H. Piper, Assistant United States Attorney, and Saeed A. Mody, Trial Attorney for the U.S. Department of Justice, Civil Rights Division, hereby offer this memorandum regarding the defendant's proposed plea of guilty and whether the defendant's conduct establishes a "true threat."

### Procedural History

The defendant was arrested on a complaint and warrant charging two offenses: 1) solicitation to commit a civil rights violation (burning of a mosque) under 18 U.S.C. §§ 373 and 247; and 2) interstate communication of a threat in violation of 18 U.S.C. § 875(c). The defendant was arrested on Friday, April 10, 2015, and his initial appearance was held on Monday, April 13, 2015. The preliminary hearing and detention hearing were held on Monday, April 20, 2015. The Court determined there was probable cause for both offenses. After the preliminary hearing, the parties entered into a plea agreement to a one count Bill of Information charging the defendant with interstate communication of threats in violation of 18 U.S.C. § 875(c).

Bill of Information, Plea Agreement and Factual Basis

The United States filed a one count Bill of Information charging the interstate communication of a threat. The Bill of Information states as follows:

> The United States Attorney charges that on or about March 6, 2015, in the Eastern District of Tennessee, the defendant, ROBERT R. DOGGART, knowingly and willfully did transmit in interstate commerce from the Eastern District of Tennessee to the State of Texas, a communication to injure individuals living in or near Hancock, New York, threats which were communicated to an individual known to the United States Attorney, and the communication contained a threat to injure residents of "Islamberg," specifically to shoot or kill the inhabitants of Islamberg as the defendant was carrying out an attack on that community to burn buildings found there, including a mosque, school and cafeteria. All in violation of Title 18, United States Code, Section 875(c).

(R. 12, Bill of Information, PageID# 41.)

The plea agreement entered into by the parties calls for the defendant to plead guilty to the one count Bill of Information, and provides the following factual basis:

> In or about February, 2015, agents with the Federal Bureau of Investigation became aware that the defendant was communicating threats concerning an area located outside of Hancock, New York, and the individuals that lived in a community there. This area is known as "Islamberg," a self-named community consisting primarily of individuals of the Islamic faith. Specifically, in a Facebook posting in February 2015, the defendant wrote that "Target 3 [Islamberg] is vulnerable from many approaches and must be utterly destroyed…" The defendant spoke with numerous other individuals (in person and over his cellular telephone) regarding his plan to attack Islamberg. The defendant justified his attack on Islamberg by claiming that the residents of Islamberg were planning a terrorist attack. The defendant stated on cellular phone communications that he planned to burn three buildings at Islamberg: a mosque, a school, and a cafeteria. The defendant was fully aware of the religious character of the mosque when he identified it as one of the buildings that needed to be burned. Additionally, the defendant suggested on a cellular telephone call that he and his group would kill some residents of Islamberg in order to carry out the plan.
> On or about March 6, 2015, the defendant used a cellular phone to call a cooperating source ("CS") with the FBI. At the time of the call, the defendant was located in Sequatchie County, Tennessee (which is within the Eastern District of Tennessee). The CS was located in El Paso, Texas at the time of the call. The defendant made clear his ultimate plan was to injure or kill the inhabitants of Islamberg in Hancock, New York. During the phone call, the defendant told the CS, "those guys [have] to be killed. Their buildings need to be burnt down. If we

can get in there and do that not losing a man, even the better." In the same recorded call, the defendant informed the CS that they could not carry pistols from Tennessee to New York because New York does not have carry permit reciprocity, but they could bring their "AR-15s, M-4s or M-16s." The defendant, in the recorded call, informed the CS that he planned to bring his M-4 rifle with four magazines. The defendant then told the CS he could provide the CS with the "meanest shotgun on Earth." When discussing the schedule for the operation, the defendant told the CS that "the drop dead date is April 15 because that's when those guys in OAF say they're gonna start a civil war." OAF is a militia organization with which the defendant had been in contact.

      The defendant took numerous steps in furtherance of the threats that he communicated, many of which were discovered by the FBI through its use of [a] wiretap issued pursuant to Title III, and other investigative techniques. At various points during the investigation, the defendant traveled to other locations to meet with individuals the defendant believed would assist him with his plan. The defendant traveled to Nashville, Tennessee, on March 17, 2015, and met with the CS. At that time, the defendant showed to the CS a map of Islamberg. On that map the defendant identified the buildings he intended to destroy. Also, the defendant carried firearms with him to Nashville, including an M-4 type weapon as well as a shotgun. Furthermore, the defendant traveled to Greenville, South Carolina, in order to meet with another individual the defendant believed was interested in assisting him. Even though this individual and the defendant did not meet, the defendant spoke with this individual on his cellular telephone and discussed the burning of the buildings, including the mosque, and other topics. These calls were intercepted pursuant to the Court's authorized wiretap interception. In other intercepted phone calls, the defendant stated that his "M-4" was "battle tested" at 350 meters, that he would serve as the stand-off gunner during the assault, and that he would shoot the residents of Islamberg during the attack. The defendant also solicited the help of other "gunners" via Facebook. The investigation of the defendant's threatening communications required significant resources and time by the FBI in both Tennessee and South Carolina.

      As part of this plea agreement, the defendant admits that he willfully and knowingly sent a message in interstate commerce containing a true threat to injure the person of another, in violation of 18 U.S.C. § 875(c). Many of the acts listed above occurred in the Eastern District of Tennessee.

(R. 14, Plea Agreement, PageID# 46-48.) The defendant, his counsel, and counsel for the government all signed the plea agreement. (*Id*. at 53.)

After the filing of the plea agreement, this Court entered an order directing the parties to address the issue of whether the "factual basis in the proposed plea agreement contains

communication on Defendant's part amounting to a 'true threat' as required under 18 U.S.C. § 875(c)." (R. 16, Order, PageID# 57.)

Law and Argument

The elements of an offense under 18 U.S.C. § 875(c) are as follows: 1) the defendant knowingly sent a message in interstate foreign commerce; and 2) the message contained a true threat to injure the person of another. *See, United States v. Jeffries*, 692 F. 3d 473, 477-78 (6th Cir. 2012); *United States v. Alkhabaz*, 104 F.3d 1492, 1494 (6th Cir. 1997). A statute "which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Watts v. United States*, 394 U.S. 705, 707 (1969). The First Amendment, therefore, permits conviction under these types of crimes only if the communication at issue constitutes a "true threat." *See, Virginia v. Black*, 538 U.S. 343, 359–60 (2003) (explaining that the First Amendment "permits a state to ban a 'true threat'").

The United States Court of Appeals for the Sixth Circuit has defined a "true threat" as a threat that a "reasonable person would perceive…as real." *Jeffries*, 692 F. 3d at 478. "True threats" are a historic and traditional exception to the bar against content-based restrictions on speech. *See, United States v. Alvarez*, 132 S.Ct. 2537, 2544 (2012). They are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359. A true threat is one that communicates a "serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id*. at 359. "A 'true threat' is a serious threat—not idle talk, a careless remark, or something said jokingly—that is made under circumstances that would lead a reasonable person to believe that the Defendant intended to

[unlawfully injure] another person." Pattern Crim. Jury Instr. 11th Cir. C.18.30.3 (2010). Furthermore, the threat is examined under an "objective" standard: to convict under § 875(c), a jury need conclude only that "a reasonable person (1) would take the statement as a serious expression of an intention to inflict bodily harm (the *mens rea*), and (2) would perceive such expression as being communicated to effect some change or achieve some goal through intimidation (the *actus reus*)." *Jeffries*, 692 F. 3d at 479 (*citing*, *Alkhabaz*, 104 F.3d at 1495)).

In *Alvarez* (a "stolen valor" case), the Court identified several specific categories of content-based restrictions on speech which have been permitted: (1) advocacy intended, and likely, to incite imminent lawless action, (2) obscenity, (3) defamation, (4) speech integral to criminal conduct, (5) "fighting words," (6) child pornography, (7) fraud, (8) true threats, and (9) speech presenting some grave and imminent threat the government has the power to prevent. *Alvarez*, 132 S.Ct. at 2544. "These categories have a historical foundation in the Court's free speech tradition. The vast realm of free speech and thought always protected in our tradition can still thrive, and even be furthered, by adherence to those categories and rules." *Id*. Inasmuch as "stolen valor" did not fall within any of these nine defined categories, the Court ruled the statute (as then drafted) unconstitutional. In so ruling, the Court stated "[t]he remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *Id*. at 2550 (*citing Whitney v. California*, 274 U.S. 357, 377 (1927)).

The threats issued in the instant case are "true threats" as defined by the statute and case law.

> All that the First Amendment requires in the context of a § 875(c) prosecution is that the threat be real—a "true threat." *United States v. Watts*, 394 U.S. 705, 708, (1969). Once that has been shown, once the government shows that a reasonable person would perceive the threat as real, any concern about the risk of unduly

chilling protected speech has been answered. For if an individual makes a true threat to another, the government has the right, if not the duty, to "protect[ ] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur," all of which places the menacing words and symbols "outside the First Amendment."

*Jeffries*, 692 F.3d at 478. In the instant case, the threat issued by the defendant ("those guys [have] to be killed. Their buildings need to be burnt down. If we can get in there and do that not losing a man, even the better"), when viewed by a reasonable person, would be perceived as real. Additionally, the context of the defendant's threat establishes that the threat was real: the defendant posted a request for other "gunners" on his Facebook page; the defendant discussed carrying firearms to Hancock, New York; the defendant planned to burn the mosque and other buildings at Islamberg; the defendant stated that he would be the "stand-off gunner" using his M-4 rifle which was "battle tested" at 350 yards; and the defendant traveled from Chattanooga to Nashville to meet with the CS in order to discuss plans for the attack. Certainly, anyone hearing the defendant's threat to kill people, when viewed in isolation or in context, would understand and appreciate that the defendant's words constituted a "true threat." "Whether a statement constitutes a 'true threat' is a fact-intensive inquiry, in which the language, the context in which the statements are made, as well as the recipients' responses are all relevant." *United States v. Twitty,* 163 F. App'x. 676, 681-82 (10th Cir. 2015) (*citing*, *Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1167–68 (10th Cir. 2009)); *see also*, *United States v. Hankins*, 195 F. App'x. 295, 300 (2006) (a statement's context must be considered in determining whether it is a true threat); *United States v. Cox*, 957 F.2d 264, 266 (6th Cir. 1992)(court may examine the context of threat in determining whether it meets threshold requirement under 875(c)). After hearing these threats (standing alone or in context), which were conveyed to the Confidential Source, the government had "the right, if not the duty, to 'protect[ ] individuals from the fear of violence,

Page **6** of **11**

Case 1:15-cr-00039-CLC-SKL   Document 24   Filed 05/19/15   Page 6 of 11   PageID #: 206

from the disruption that fear engenders, and from the possibility that the threatened violence will occur.'" The statement made by the defendant, that the residents of Islamberg have to be killed, combined with the other statements made by the defendant and the actions taken by the defendant, can and should be interpreted as a "serious expression of intent to harm" the residents of Islamberg. *Hankins*, 195 F. App'x. at 301. The defendant's statements were not part of an "uninhibited marketplace of ideas" (*see*, *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)); the targets of the defendant's statements cannot rebut the unreasoned with the rational, the uninformed with the enlightened, the straightout lie with the simple truth. *Alvarez*, 132 S.Ct. at 2550.

It is also not necessary that a true threat be made "directly to the proposed victim." *Twitty*, 163 F.Appx. at 681. In *Alkhabaz*, the court rejected the notion that the threat must be conveyed to the intended victim, or even conveyed to one who had "some connection" to the intended victim. *Alkhabaz*, 104 F.3d at 1494-95. Nor should it matter that the threat was conveyed to an undercover agent or confidential informant. *United States v. Cope*, 283 F. App'x 384, 389 (6th Cir. 2008) (threat to kill an Assistant United States Attorney conveyed to undercover agent was sufficient); *Hankins*, 195 F. App'x. at 300 (it is no defense to solicitation for violent crime that the solicited individual was an undercover agent and therefore incapable of completing the crime). Furthermore, the threat need not be aimed at any specific individual or group. *Cox*, 957 F.2d at 266 (threat to go to bank and "hurt people" was sufficient for § 875(c) prosecution); *see also, United States v. Schroeder,* 902 F.2d 1469 (10th Cir. 1990) (the defendant informed an Assistant United States Attorney that "people would get hurt" if the government did not give him money); *United States v. Lincoln*, 589 F.2d 379 (8th Cir. 1979)(defendant mailed letters threatening to kill the judges of the Eighth Circuit)(cited in *Cox*).

In *Alkhabaz*, *supra*, the Sixth Circuit reversed the § 875(c) threat conviction of the defendant. Alkhabaz was charged with sending emails "express[ing] a sexual interest in violence against women and girls." *Alkhabaz*, 104 F.3d at 1493. The Sixth Circuit upheld the dismissal of the indictment, concluding that to come within the ambit of a § 875(c) charge a threat must be communicated with the intent (defined objectively) to intimidate. *Id*. at 1493, 1495. The court re-affirmed that the statute does "not express[ ] a subjective standard." *Id*. at 1496. In upholding the dismissal, the court stated

> Even if a reasonable person would take the communications between [the participants] as serious expressions of an intention to inflict bodily harm, no reasonable person would perceive such communications as being conveyed to effect some change or achieve some goal through intimidation. Quite the opposite, [the participants] apparently sent e-mail messages to each other in an attempt to foster a friendship based on shared sexual fantasies.

*Id*. at 1496. In the instant case, the defendant intended for his threats to be taken seriously, and he conveyed them in order to achieve a goal. In *Alkhabaz*, the court cited with approval a case where a defendant was properly convicted for threatening PLO leader Yasser Arafat. *Id*. at 1495 (citing *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976)). In *Kelner*, the defendant threatened to assassinate Arafat during a news conference. The defendant claimed that his purpose in issuing the threat was to inform the PLO that "we (as Jews) would defend ourselves and protect ourselves…" *Id*. at 1021–22. After reviewing the proof, the Second Circuit upheld the defendant's conviction, finding that the jury had been properly charged and that the threats issued by the defendant were more than mere "political hyperbole." *Id*. at 1025, 1028. Relying on *Kelner*, the Sixth Circuit stated in *Alkhabaz* that "the goal [of the threats], although not rising to the level of extortion, may be the furtherance of a political objective."

The defendant's goal in the instant case, at the very least, was to further his objective of destroying Islamberg. In *United States v. Hankins*, *supra*, the defendant, after being arrested on narcotics charges, talked to a confidential informant about killing law enforcement officers who were involved in his arrest. 195 F. App'x 295, 300 (6th Cir. 2006). The defendant explicitly discussed taking out "hits" on the officers to the informant; he was convicted under 18 U.S.C. § 1513 (retaliating against a witness, victim, or an informant). The Sixth Circuit rejected the defendant's argument that his statements were not "true threats" because the defendant's explicit threats could reasonably be interpreted as a serious expression of intent to harm and the context in which the statements were made. *Id*. at 301. Specifically, in regards to the context, the court noted that the defendant made the statements in the privacy of his own home, to a friend, only a few months after being arrested. *Id*. Moreover, the court found there was no political context to the defendant's statements, because of the violent content of the statements and the private location in which they were made.

Although the defendant in this case does express political views, those views merely provided the impetus for his detailed plan to carry out an attack on Islamberg. The defendant attempted to recruit people to assist him, he discussed intricacies of his plan with the confidential source as to how they could inflict the most damage on the unsuspecting community in Islamberg, and he offered to provide the confidential source with the "meanest shotgun on earth" as way to further entice the source to join him. The defendant's statements were not protected "political speech" – they were a calculated plan evidencing an intent to attack Islamberg and to kill people in the process. By communicating his threats to the confidential informant and others, the defendant was

actively soliciting others to join him and to acquire additional knowledge, expertise, and means to make his speech a reality. As such, the defendant did far more than just engage in the "shared fantasies" rejected as a basis for a § 875(c) prosecution by the Sixth Circuit in *Alkhabaz*; he in fact conveyed threats to injure or kill others in order to accomplish his goal of committing violent acts against the residents of Islamberg.

Finally, the government would be remiss if it did not mention Judge Sutton's dubitante opinion in *United States v. Jeffries*. In the dubitante opinion, Judge Sutton opined that the threat statutes, when given their plain meaning and upon review of the legislative history, may require some subjective intent. *Jeffries*, 692 F. 3d at 483-84. Even though the dubitante opinion underscores that the law only requires the effect of a threat on an objective person (*id*. at 483), the government submits that even if the required intent was subjective, the defendant's conduct would fall within those parameters. The defendant clearly intended to convey a threat to injure the person of another, even when viewed subjectively. Given the explicit nature of the threat, the context of the other conversations cited in the factual basis, and the specific acts undertaken by the defendant, a specific intent to communicate a threat to injure has been shown.

Conclusion

The factual basis in the plea agreement sets forth sufficient facts to establish a "true threat" under 18 U.S.C. § 875(c). The defendant is in agreement that he has conveyed a "true threat" in interstate commerce. Accordingly, the government respectfully requests that the Court accept the defendant's plea to the one count Bill of Information.

Respectfully submitted,

WILLIAM C. KILLIAN
United States Attorney

By: s/ Perry H. Piper
Perry H. Piper
Assistant United States Attorney

By: s/ Saeed A. Mody
Saeed A. Mody
Trial Attorney
Civil Rights Division

CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2015, this response was filed electronically, and notice of its filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Any parties not listed as being served by the Court's filing system will be served by regular United States mail, postage prepaid.

s/ Perry H. Piper
Perry H. Piper
Assistant United States Attorney