UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No: 1:15-CR-39 |
| | ) | |
| | ) | |
| ROBERT R. DOGGART, | ) | Judge Collier |
| | ) | |
| Defendant. | ) | |

**MOTION TO APPROVE PLEA AGREEMENT &
MEMORANDUM OF LAW IN SUPPORT**

COMES NOW, the Defendant, by and through counsel and hereby files this Motion to approve the previously filed Plea Agreement & Memorandum of Law in support. The Defendant submits that the factual basis contained in the plea agreement is sufficient to constitute a "true threat" as required under 18 U.S.C. § 875(c). If oral argument would benefit the Court, counsel for Mr. Doggart requests oral argument.

The Defendant would show unto the Court as follows:

1. On or about April 29, 2015, the parties by agreement filed a Bill of Information charging the Defendant with a violation of 18 U.S.C. § 875. Contemporaneous with that filing, the parties submitted a plea agreement to that specific offense with a detailed factual basis. (R. 12 Bill of Information, R. 14 Plea Agreement).[1]

---

[1] Mr. Doggart was arrested on a 2nd charge. Following a preliminary hearing in which Magistrate Lee found probable cause, the parties negotiated the plea agreement at issue in this case. Both the Government and Defendant believe that there is an adequate factual basis for a violation of 18 U.S.C. § 875 in this case. And both parties are moving to Court to find the factual basis sufficient.

1

2. The factual basis stated as follows:

In or about February, 2015, agents with the Federal Bureau of Investigation became aware that the defendant was communicating threats concerning an area located outside of Hancock, New York, and the individuals that lived in a community there. This area is known as "Islamberg," a self-named community consisting primarily of individuals of the Islamic faith. Specifically, in a Facebook posting in February 2015, the defendant wrote that "Target 3 [Islamberg] is vulnerable from many approaches and must be utterly destroyed…" The defendant spoke with numerous other individuals (in person and over his cellular telephone) regarding his plan to attack Islamberg. The defendant justified his attack on Islamberg by claiming that the residents of Islamberg were planning a terrorist attack. The defendant stated on cellular phone communications that he planned to burn three buildings at Islamberg: a mosque, a school, and a cafeteria. The defendant was fully aware of the religious character of the mosque when he identified it as one of the buildings that needed to be burned. Additionally, the defendant suggested on a cellular telephone call that he and his group would kill some residents of Islamberg in order to carry out the plan.

On or about March 6, 2015, the defendant used a cellular phone to call a cooperating source ("CS") with the FBI. At the time of the call, the defendant was located in Sequatchie County, Tennessee (which is within the Eastern District of Tennessee). The CS was located in El Paso, Texas at the time of the call. The defendant made clear his ultimate plan was to injure or kill the inhabitants of Islamberg in Hancock, New York. During the phone call, the defendant told the CS, "those guys [have] to be killed. Their buildings need to be burnt down. If we can get in there and do that not losing a man, even the better." In the same recorded call, the defendant informed the CS that they could not carry pistols from Tennessee to New York because New York does not have carry permit reciprocity, but they could bring their "AR-15s, M-4s or M-16s." The defendant, in the recorded call, informed the CS that he planned to bring his M-4 rifle with four magazines. The defendant then told the CS he could provide the CS with the "meanest shotgun on Earth." When discussing the schedule for the operation, the defendant told the CS that "the drop dead date is April 15 because that's when those guys in OAF say they're gonna start a civil war." OAF is a militia organization with which the defendant had been in contact.

The defendant took numerous steps in furtherance of the threats that he communicated, many of which were discovered by the FBI through its use of wiretap issued pursuant to Title III, and other investigative techniques. At various points during the investigation, the defendant traveled to other locations to meet with individuals the defendant believed would assist him with his plan. The defendant traveled to Nashville, Tennessee, on March 17, 2015, and met with the CS. At that time, the defendant showed to the CS a map of Islamberg. On that map the defendant identified the buildings he intended to destroy. Also, the defendant carried firearms with him to Nashville, including an M-4 type weapon as well as a shotgun. Furthermore, the defendant traveled to Greenville, South Carolina, in order to meet with another individual the defendant believed was interested in

2

assisting him. Even though this individual and the defendant did not meet, the defendant spoke with this individual on his cellular telephone and discussed the burning of the buildings, including the mosque, and other topics. These calls were intercepted pursuant to the Court's authorized wiretap interception. In other intercepted phone calls, the defendant stated that his "M-4" was "battle tested" at 350 meters, that he would serve as the stand-off gunner during the assault, and that he would shoot the residents of Islamberg during the attack. The defendant also solicited the help of other "gunners" via Facebook. The investigation of the defendant's threatening communications required significant resources and time by the FBI in both Tennessee and South Carolina.

As part of this plea agreement, the defendant admits that he willfully and knowingly sent a message in interstate commerce containing a true threat to injure the person of another, in violation of 18 U.S.C. § 875(c). Many of the acts listed above occurred in the Eastern District of Tennessee.

(R. 14, Plea Agreement, Page ID# 46-48.)

3. Following the submission of the plea agreement, this Court requested the parties to submit briefs to address whether the factual basis in the proposed plea agreement contained a "true threat" as required under 18 U.S.C. §875(c). (R. 16, Order).

## MEMORANDUM

Title 18, Section 875(c) of the United States Code provides, "[w]hoever transmits in interstate commerce or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

To be convicted of an § 875(c) violation, the Government must allege and prove three (3) elements[2]: (1) a transmission in interstate or foreign commerce; (2) a communication containing a threat; and (3) the threat must be a threat to injure [or kidnap] the person of another. *United States*

---

[2] The Government asserts that there are two (2) elements to this offense: 1) the defendant knowingly sent a message in interstate foreign commerce; and 2) the message contained a true threat to injure the person of another. *See, United States v. Jeffries*, 692 F. 3d 473, 477-78 (6th Cir. 2012); *United States v. Alkhabaz*, 104 F.3d 1492, 1494 (6th Cir. 1997). The Defendant does not disagree with this assertion.

3

*v. Alkhabaz,* 104 F.3d. 1492, 1494 (6th. Cir. 1997); *United States v. DeAndino*, 958 F. 2d 146, 147 (6th. Cir. 1992).

In *Alkhabaz*, two men exchanged emails which included their sexual fantasies to do violence to and harm women. Ultimately, the District Court dismissed the indictment against the defendant. The Sixth Circuit affirmed holding, "(e)ven if a reasonable person would take the communications between Baker and Gonda as serious expressions of an intention to inflict bodily harm, no reasonable person would perceive such communications as being conveyed to effect some change or achieve some goal through intimidation. Quite the opposite, Baker and Gonda apparently sent e-mail messages to each other in an attempt to foster a friendship based on shared sexual fantasies." *Alkhabaz*, 104 F.3d at 1496.

In reaching this conclusion, the Sixth Circuit discussed extensively the type of threat that needed to be involved to turn simple speech into a violation of 18 U.S.C. § 875(c). The case law makes it clear that the "threat" must be a "true threat." But in addition, the "true threat" must include some type of motivation or objective to effect some change by intimidating another by extortion, coercion, or thru political objectives.

The *Alkhabaz* Court stated, "…it is necessary to consider the nature of a threat. At their core, threats are tools that are employed when one wishes to have some effect, or achieve some goal, through intimidation. This is true regardless of whether the goal is highly reprehensible or seemingly innocuous." *Alkhabaz*, 104 F.3d at 1495.

The Court went further to include four (4) instances which they believed constituted "true threats": (1) statements a Defendant made during a telephone call to a bank that he would "hurt" people at the bank unless they returned his vehicle that the bank had repossessed. *United States v. Cox,* 957 F.2d 264 (6th Cir 1992); (2) statements made by a Defendant to an AUSA that "people

would get hurt" if the government did not give him money. *United States v. Schroeder,* 902 F. 2d 1469 (10th Cir.), *cert. denied,* 498 U.S. 867, 111 S.Ct. 181, 112 L.Ed.2d 145 (1990); (3) statements made to assassinate Yasser Arafat, PLO leader, during a news conference which were made by a defendant to "further the political objectives of his organization by intimidating the PLO with warnings of violence." *Alkhabaz*, 104 F.3d at 1495; *United States v. Kelner,* 534 F. 2d 1020 (2d Cir. 1976); and (4) statements to communicate a bomb threat, "even if the bomb does not exist, for the sole purpose of creating a prank. However, such a communication would still constitute a threat because the threatening party is attempting to create levity (at least in his or her own mind) through the use of intimidation." *Alkhabaz*, 104 F.3d at 1495.

The *Alkhabaz* Court concluded the following:

The above examples illustrate threats because they demonstrate a combination of the mens rea with the actus reus. Although it may offend our sensibilities, a communication objectively indicating a serious expression of an intention to inflict bodily harm cannot constitute a threat unless the communication also is conveyed for the purpose of furthering some goal through the use of intimidation.

Accordingly, to achieve the intent of Congress, we hold that, to constitute "a communication containing a threat" under Section 875(c), a communication must be such that a reasonable person (1) would take the statement as a serious expression of an intention to inflict bodily harm (the mens rea), and (2) would perceive such expression as being communicated to effect some change or achieve some goal through intimidation (the actus reus). *Id*. at 1495.

In *Virginia v. Black*, 538 U.S. 343, 359-60 (2003), the United States Supreme Court stated to constitute a true threat, "[t]he speaker need not actually intend to carry out the threat." The prohibition "protects individuals from the fear of violence" and "from disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur… Intimidation in the constitutionally proscribable sense of the word is a type of true threat." *Id.*

5

Courts look to the nature of the threat and the context of the threat to determine whether the threat is a "true threat." *Id*. Additionally, the Court must look objectively at all the surrounding facts and circumstances. *DeAndino*, 958 F.2d at 148; *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)) (holding that true threats "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.")

In *Watts*, the United States Supreme Court examined the context of a statement made during a Washington D.C. political rally and reversed a Defendant's conviction under 18 U.S.C. § 871 even though the Defendant shouted that"[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." The Court stated that the statute initially requires that the Government prove "a true 'threat.'" *Watts*, 394 U.S. at 708. In reasoning that the statement at issue did not constitute a true threat, the Court stated:

> We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For we must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' …..The language of the political arena, like the language used in labor disputes….is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was 'a kind of very crude offensive method of stating a political opposition to the President.' Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise. *Watts*, 394 U.S. at 708.

In the most recent Sixth Circuit decision regarding § 875(c) violations, the Sixth Circuit upheld the conviction of a Defendant who posted a YouTube video of himself playing a guitar (complete with an American flag painted on it) and singing a song which included lyrics that he

6

was going to kill the Chancellor presiding over his daughter's child custody hearing. *United States v. Jeffries*, 692 F. 3d 473, 477-78 (6th Cir. 2012).

The *Jeffries* Court citing to *Alkhabaz* noted that the communications present in *Jeffries* had an intent to effect some change or achieve some goal. The Court stated:

> The threats had an objective: "getting the judge to "do the right thing July 14th." *Id.* And through all of the threats, his words (I am "not kidding") and his appearance (plenty of glares and no hints of a smile) left the distinct impression that the threats were real. He urged others to bomb judges' cars, and claimed he was willing to go to prison if necessary. Nor was he shy about his distribution of the video. He posted the video publicly, sent it to a television station and state representative, and urged others to "take it to the judge." R.103–5. On this record, a rational juror could conclude that a reasonable person would take the video as "a serious expression of an intention to inflict bodily harm ... communicated to effect some change or achieve some goal." *Alkhabaz,* 104 F.3d at 1495; *Jeffries*, 692 F.3d at 481.

Outside of the Sixth Circuit, other circuits, when determining whether a reasonable person would take the Defendant's communication as a serious expression of his intention to inflict bodily harm to effect some change or achieve some goal through intimidation, have looked to a number of factors including: (1) whether a reasonable person would feel apprehension after hearing the threat; (2) whether the person has taken additional steps to back up their threat; (3) whether the Defendant has the means to carry out their plan of attack; and (4) whether the Defendant had the necessary knowledge to carry out their threat. *United States v. Parr*, 545 F.3d 491 (7th. Cir. 2008)(finding that a communication to blow up a federal building made in conversation with a cell mate, even though he had not set a certain date or time, was a serious expression of his intent given his background in weapons and explosions, his ability to carry out the threat, and his admiration of domestic terrorists).

7

Further, Courts look to a Defendant's background, including affiliations with particular groups, in order to determine if a Defendant's communication could reasonably be interpreted as a serious expression of an intention to inflict bodily harm. *Id*. at 498.

The Sixth Circuit looks to whether the specific communication has an objective, whether the Defendant involves others in the process or the plan, and whether the Defendant is selective in the amount of people to which he communicates the plan. *United States v. Jeffries*, 692 F.3d 473, at 481 (6th. Cir. 2012).

In the present case, the Defendant communicated his intentions regarding an attack on Islamberg over the course of several months through a variety of means which included cellular telephone calls with a confidential source, cellular telephone calls to other individuals in multiple states which were captured during the Court authorized wire interception, and Facebook messages. Towards the end of the authorized communication, the Defendant did attempt to use "code" for his statements. The communications involved others in the process including individuals in Texas, Illinois and South Carolina. This was not a one-time post on YouTube, but repeated statements over the course of 2-3 months to a variety of different individuals, some part of the plan, some not. Some of the communications were to family members who passed over Mr. Doggart's threatening statements as just rhetoric. Some of the communications were to individuals whom Mr. Doggart had never met and who resided in other states such as Texas, South Carolina and Illinois.

The case law is clear that a true threat need not be made to the supposed victim. *Alkhabaz*, 104 F.3d at 1494-95. Further, it does not matter if the threat was made to a confidential informant or a confidential source. *United States v. Cope*, 283 F.App'x 384, 389 (6th Cir. 2008).

The issue for this Court is whether a reasonable person would look at Mr. Doggart's telephone calls, his Facebook messages, the context of those statements, his background, and his

8

conduct of traveling to Nashville and to South Carolina and find that these were (1) a serious expression of an intention to inflict bodily harm and (2) were made to effect some change or achieve some goal through intimidation. *Id*. at 1495. The Defendant submits that a reasonable person and/or a jury could conclude that both elements are met in this instant case.[3]

Threatening, by telephone and Facebook, to shoot people and to destroy buildings and communicating those threats to people who you have never met, who reside in a different states, and who you know are members of so-called militia groups are certainly expressions to inflict bodily harm. Per *Virgnia v. Black*, the issue is not whether Mr. Doggart intended to carry out these plans, but whether a reasonable person would conclude that these were serious expressions of an intent to inflict bodily harm. These statements coupled with his actions which included: identifying specific "targets" within the community of Islamberg; researching gun laws in New York; researching the local fire and police department; traveling to Nashville to meet a supposed participant (CS) with his firearms; traveling to South Carolina to meet another participant (even though they never met); printing out maps of aerial views of Islamberg; assigning a title to himself and other members in the group; acting as if he was attempting to lead this group; and attempting to comply with a time deadline, all provide a context that taken with his communications would lead a reasonable person to conclude that these were serious expressions of an intent to inflict bodily harm.

So, therefore, were these statements made to effect some change or achieve some goal through intimidation? Unlike the private emails of one's sexual fantasies that were exchanged in

---

[3] The Defendant would also point out to the Court that the instant plea agreement came after negotiations between the parties. The plea offer was approved by the Department of Justice. Counsel for the Defendant researched this issue and was well aware of the caselaw before entering the plea. Further, Mr. Doggart himself has reviewed the case law and also believes that this plea agreement is in his best interest.

9

*Alkhabaz*, the objective of these communications would appear to a reasonable person that Mr. Doggarts was attempting to achieve a political objective.

First, the factual basis in this case is two and a half pages in length. The plea agreement notes that there are certainly other facts known by the parties which might be relevant to sentencing that were not included in the factual basis.

As additional background, it is important to note that in 2014, Mr. Doggart lost his bid for Congress in the 4th District of Tennessee. During that campaign, Mr. Doggart, peaceably, in order to further his political campaign, traveled to two (2) other Islamic communities in the State of Tennessee and spoke to local leaders as to whether they believed the Islamic communities were benevolent. He found those communities to be peaceful and reported those findings back to people involved in his campaign.

He also traveled to Laredo, Texas and to the United States' border to see if the border was safe and secure. Each of these were for a political purpose, but were peaceful attempts by Doggart in furtherance of his political campaign.

Subsequently, Mr. Doggart lost the campaign but became a public figure to certain "groups" and militia organizations as an individual who would actively investigate claims that certain Islamic communities were potentially extreme or dangerous. The groups and outside individuals along with Mr. Doggart began focusing on the community of Islamberg located in Hancock, New York.

With the campaign behind him, Mr. Doggart began communicating with these individuals who looked to him as a potential leader. Even though Mr. Doggart had no military training and no explosive training, he nicknamed himself "commander" and his speech turned more

10

Case 1:15-cr-00039-CLC-SKL   Document 25   Filed 05/20/15   Page 10 of 12   PageID #: 221

authoritative and violent. This is when Mr. Doggart's rhetoric and speech crossed the line from political speech into criminal threats. Those specific statements are included in the factual basis.

To make matters worse, even national news stations such as Fox News reported in January 2015 that Hancock, NY was one of the most extreme Islamic communities in the United States.[4] Whether Islamberg is an extremist Islamic organization, and whether the residents of Islamberg pose any type of threat to the United States is not the analysis. Certainly, that is a concern, if true, for law enforcement, not individuals living in Tennessee who have lost an election. There certainly appears to be some evidence that Mr. Doggart's beliefs were flat out wrong. For this Court, whether Islamberg posed a real threat is irrelevant to this Court's analysis of the factual basis.

Mr. Doggart's statements made it clear that his reasoning behind the potential attack on Islamberg was his fear that the residents of Islamberg were planning a terrorist attack on the United States. He did not believe that the United States was safe. He thought that residents of Islamberg constituted a threat. This context of Mr. Doggart's statements is no excuse for his actions, but rather provide a backdrop for the objective of the true threats that he made. That objective, a reasonable person could conclude, was that he believed by attacking the town of Islamberg, he was going to put a stop to potential terrorist plots and also, on a national level, he would effect change by bringing attention to the town of Islamberg and their actions. This meets the second prong of the "true threat" analysis.

Respectfully, there is a sufficient factual basis in the plea agreement to constitute a violation of § 875(c). The Defendant respectfully requests that this Court find that there is a factual basis for a plea and to set this matter for re-arraignment.

---

[4] http://nation.foxnews.com/2015/01/14/video-muslim-training-guerilla-warfare-new-york

Respectfully Submitted,

**DAVIS & HOSS, P.C.**


s/Bryan H. Hoss
Bryan H. Hoss, TN BPR #021529
Janie Parks Varnell, TN BPR #031256
*Attorneys for the Defendant*
850 Fort Wood Street
Chattanooga, TN 37403
(423) 266-0605
(423) 266-0687 – fax
bryan@davis-hoss.com
janie@davis-hoss.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum of Law was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

This the 20th day of May, 2015.

s/Bryan H. Hoss
Bryan H. Hoss

12

Case 1:15-cr-00039-CLC-SKL   Document 25   Filed 05/20/15   Page 12 of 12   PageID #: 223