1        IN THE UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF TENNESSEE

3                AT CHATTANOOGA

---------------------------------------------------------
                                :
UNITED STATES OF AMERICA,       :
                                :
         Plaintiff,             :
                                :
v.                              :        1:15-CR-39
                                :
ROBERT R. DOGGART,              :
                                :
         Defendant.             :
---------------------------------------------------------

                                Chattanooga, Tennessee
                                May 6, 2015


        BEFORE:  THE HONORABLE SUSAN K. LEE,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:


        FOR THE PLAINTIFF:

        PERRY H. PIPER,
        Assistant United States Attorney
        1110 Market Street, Suite 515
        Chattanooga, Tennessee  37402


        FOR THE DEFENDANT:

        BRYAN H. HOSS
        JANIE PARKS VARNELL
        850 Fort Wood Street
        Chattanooga, Tennessee  37403



             INITIAL APPEARANCE/DETENTION HEARING

DEFENDANT'S EXHIBIT

1      Photos of diplomas, certificates, and awards    13

- - -

THE COURT:  Call the case, please.

THE COURTROOM DEPUTY:  Case Number 1:15-CR-39, USA versus Doggart.

THE COURT:  Counsel, make appearances, please.

MR. PIPER:  Perry Piper for the United States, Your Honor.

MR. HOSS:  Bryan Hoss and Janie Varnell for Mr. Doggart, Your Honor.

THE COURT:  Mr. Doggart, you're here today because a bill of information has been filed in your case.  And this is an open court proceeding.

Is the government prepared to unseal the bill of information?

MR. PIPER:  I am not, Your Honor.  I did not know that was going to be an issue today.  I think the factors that were in place previously were still -- are still in place today.

(Brief pause.)

THE COURT:  Well, as is -- was noted at the last public hearing that we had, the Court's going to be reviewing

1  the bill of information in a public proceeding.  I'm not

2  certain what justifies keeping the bill of information under

3  seal, but I'll let you address it further at the -- at an

4  appropriate time --

5           MR. PIPER:  Thank you, Your Honor.

6           THE COURT:  -- but, yes, it is at issue today.

7           Mr. Hoss, what's Mr. Doggart's position on whether

8  or not the bill of information should remain sealed?

9           MR. HOSS:  We have no objection to it remaining

10 sealed, Your Honor.

11          THE COURT:  I believe that the last time Mr. Piper

12 indicated that there was an ongoing investigation and that was

13 the reason for the need for the bill of information to -- which

14 at the time was a complaint, I guess, with different charges.

15          MR. HOSS:  That's correct.

16          THE COURT:  Do you have any information about that,

17 or are you relying on Mr. Piper?

18          MR. HOSS:  I'm relying on Mr. Piper, but my

19 understanding is, it is still an ongoing investigation.

20          THE COURT:  I don't -- I don't doubt -- I'm just

21 trying to see if you have any other basis other than the

22 government's justification.

23          MR. HOSS:  No new basis, Your Honor.

24          THE COURT:  Or any additional basis.

25          MR. HOSS:  No additional.  No additional basis.

1          THE COURT:  All right.  So, from Mr. Doggart's

2    perspective, there's no basis for sealing the bill of

3    information?

4          MR. HOSS:  There is no new basis to seal or

5    additional basis, Your Honor.

6          THE COURT:  Maybe it's semantics, but I want to

7    understand.

8          MR. HOSS:  All right.

9          THE COURT:  I didn't understand Mr. Doggart ever had

10   a basis for sealing it.  It was always the government's basis.

11   And when you say "no new basis," I want to see whether

12   Mr. Doggart has any basis for sealing the record, or is it

13   simply the government's basis that I need to address?

14         MR. HOSS:  It is simply the government's basis that

15   you need to address.  But we have no objection to the

16   government's position of sealing.

17         THE COURT:  I understood that.

18         MR. HOSS:  Okay.

19         THE COURT:  And, Mr. Doggart, this is an arraignment

20   being held on the bill of information.  When I last saw you,

21   the Court addressed with you the complaint that had been filed

22   in your case, and a hearing was held with respect to the issue

23   of detention.  And actually the way I recall it was, I think

24   Judge Carter held a proceeding, and then I held a detention

25   proceeding.  But, in any event, you've had two proceedings

related to a complaint.  Since that time a bill of information

has been filed.  The bill of information is not identical to

the complaint, and so I'll review that with you, and then I'll

address any further matters that come up as a result.

Now, the constitutional rights that you've been

informed of previously apply.  You have the right to remain

silent.  Anything you say can be used against you in this or

further proceedings.  The-- Of course you're here represented

by your appointed attorneys.  The only information I intend to

ask you today relates to your understanding of the

information.  So I won't be asking you anything about the

merits; and if you think I am, before you answer, you should

consult with your lawyers.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  If you'll raise your right

hand, you'll be sworn in.

(The defendant was duly sworn.)

THE COURT:  All right.  Mr. Doggart, have you been

provided with a copy of the bill of information?

THE DEFENDANT:  Yes, ma'am.  It's right here.  First

time I've seen it.  Yes, ma'am.

(Off-the-record discussion.)

THE DEFENDANT:  Yes.  We looked at it, a previous

draft of what I see here before me, yes, ma'am.

THE COURT:  All right.  It's a one-count bill of

1   information, and it charges you with interstate communication

2   of threats.  Do you understand the charge pending against you?

3            THE DEFENDANT:  I do, Your Honor.

4            THE COURT:  All right.  Mr. Piper is going to now

5   give you information.  That information that he's going to give

6   you is going to be, Number 1, what is the potential penalty if

7   you were to be convicted as currently charged.  He's also going

8   to tell you what the government's position is about continuing

9   to detain you given this -- given this charge.  And then we'll

10  address matters further.

11           THE DEFENDANT:  Yes, ma'am.

12           MR. PIPER:  Thank you, Your Honor.  On the one-count

13  bill of information the penalty is as follows:  There is no

14  mandatory minimum.  It's up to 5 years in prison, is the

15  statutory maximum, up to a 250,000-dollar fine, up to 3 years

16  of supervised release.  The government is still seeking

17  detention in this case, Your Honor.  And the rebuttable

18  presumption is not triggered, and I can state that definitively

19  because it was -- even though it was a crime of violence, it

20  would have to be up to ten years.

21           THE COURT:  All right.  And we had an issue about

22  that last time.  And I understand your current position.  But

23  it is your position that the interstate communication of a

24  threat is a crime of violence and therefore detention becomes

25  at issue under 3142(f)(1).  Is that correct?

1          MR. PIPER:  Yes, ma'am.

2          THE COURT:  Mr. Hoss, do you agree?

3          MR. HOSS:  I do.

4          THE COURT:  All right.  So the government is seeking

5     to detain your client.  And we had a hearing at a time when

6     there were more extensive charges, and there was an issue about

7     mental health treatment that was undefined.  Is Mr. Doggart

8     seeking to introduce any additional evidence for the Court to

9     consider?  Because the Court has instructed the pretrial

10    service officer to look at some mental health treatments that

11    might be available, and, given the nature of the current

12    charges, believes that it might be appropriate to consider

13    conditions of release.

14         MR. HOSS:  If I can be heard by way of proffer, Your

15    Honor, we do have some additional information.

16         THE COURT:  All right.  We'll address that in a few

17    moments.  Let's make sure that there's nothing else that needs

18    to be addressed first.

19         MR. HOSS:  All right.

20         THE COURT:  Mr. Doggart, did you understand the

21    penalty information?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  All right.  Now, I don't have a date that

24    I can give you for further proceedings, because I believe that

25    Judge Collier has issued an order asking for briefs on whether

1    or not, just to simplify it, there's a true threat charged.  Is

2    that correct?

3         MR. PIPER:  That is correct, Judge.

4         THE COURT:  All right.  So at this point I can't give

5    you a schedule.  I do understand that you have submitted a plea

6    agreement that you would like the Court to consider.  But the

7    consideration of that plea agreement will be delayed pending

8    the briefing.

9         THE DEFENDANT:  Yes, ma'am.

10        THE COURT:  You have, by the filing of the plea

11   agreement, indicated to the court that you want to plead guilty

12   to this charge, and so at an appropriate time the Court will

13   address that further with you.  And I have no dates that I can

14   give you for proceeding beyond that.  Is there anything else

15   that we need to address other than the sealing and the

16   detention issues?

17        MR. HOSS:  No, Your Honor.

18        THE COURT:  All right.  What do you want to proffer,

19   Mr. Hoss?

20        You can sit down, Ms. Varnell, and -- unless you're

21   making the proffer.

22        And, Mr. Doggart, you can as well.

23        THE DEFENDANT:  Thank you.

24        MR. HOSS:  The Court may recall that Mr. Doggart was

25   receiving Social Security disability.  And I believe I

1   mentioned that the family had obtained a file of all of his

2   paperwork from that application.

3          THE COURT:  Let me--  What I recall is that no one

4   could tell me what was the basis of the disability, at the

5   time, other than just kind of a general both physical and maybe

6   some anxiety.  But am I remembering that correctly?

7          MR. HOSS:  It was what they -- what Social Security

8   calls a combination of reasons, which includes physical and

9   mental.  The physical, Your Honor, is essentially in the form

10  of fibromyalgia, chronic low back pain.  He's had rotator cuff

11  surgeries.  He was living in a general state of pain that he

12  rated anywhere from seven and a half to ten on a daily basis.

13  The mental side of things, which I think the Court's bigger

14  question was, we found in the Social Security disability

15  paperwork a reference calling it a personality disorder.  And

16  just to read, it says, "The information shows--"  This is from

17  the Social Security Administration to Mr. Doggart.  "The

18  information shows that you had a heart disorder, a breathing

19  disorder, arthritis, depression, and a personality disorder.

20  Your mental condition was determined to be severe, therefore

21  you are unable to work and your claim was allowed."  And so it

22  talks about essentially two conditions, depression and a

23  personality disorder, and calls them both severe.  So that, I

24  think, at least sheds a little bit more light on the mental

25  side of that.  If the Court wants to see that paperwork, I can

1   share that with --

2          THE COURT:  Have you shared it with the government?

3          MR. HOSS:  I have not.

4          MR. PIPER:  He told me about it when we were out in

5   the hallway, Your Honor, when I came in.

6          MR. HOSS:  There you go.  (Indicating.)

7          (Off-the-record discussion.)

8          MR. HOSS:  We also provided to the government, Your

9   Honor -- and this actually goes a little bit about -- goes more

10  to his background, if you will, and not necessarily his

11  disabilities, but we have various certificates, diplomas,

12  awards, that Mr. Doggart has received, especially over the last

13  15 years, in a variety of different capacities.  And I've got

14  color photographs.  I've given a copy to the government.  But

15  if I can pass those up to the Court as well.

16         THE COURT:  If you've provided it to the government

17  first.

18         MR. PIPER:  He has, Your Honor.

19         THE COURT:  All right.

20         MR. HOSS:  Just to describe, I think, the

21  certificates to the Court, Your Honor, my client went to

22  La Salle University and obtained his master's and his Ph.D.  He

23  was sent there by TVA.  TVA actually paid for his education and

24  paid for his ability to get those two -- those two higher

25  education degrees.  But he essentially worked as -- in the '70s

1 and '80s and taught himself quite a bit about electrical

2 engineering, worked at naval bases, worked on subs, and started

3 his college career in the late '80s, early '90s, when he

4 ultimately received his associate's and then his bachelor's

5 degree in applied sciences, and then later in the '90s received

6 his master's and his Ph.D.  There is a certificate in here from

7 the American Society of Quality Control, dated December of

8 1980, showing that he's a quality engineer.  There is his

9 Thomas Edison State College, Bachelor of Science in Applied

10 Science degree.  There is the American Society for

11 Nondestructive Testing.  What he essentially does, Your Honor,

12 is, he inspects welding and welds and --

13          THE COURT:  What's this gavel one?  You skipped over

14 it.

15          MR. HOSS:  It said "President," which is a great --

16 which is a great title.

17          THE COURT:  Ironic, given that the last hearing we

18 had some evidence of his running for President.  So, tell me

19 what this is related to.

20          MR. HOSS:  In the top corner there is an ASNT,

21 American Society for Nondestructive Testing.  He was the

22 president of that organization.

23          THE COURT:  Oh, okay.

24          MR. HOSS:  The next page is the same organization,

25 just a certificate of appreciation about his time on the board.

```
 1   Same -- next page is his position as a director in that same

 2   ASNT organization.  That's Page --

 3            THE COURT:  You know, I looked through them.  I

 4   mean --

 5            MR. HOSS:  Sure.

 6            THE COURT:  -- the last time we discussed this, he --

 7   apparently he was a model citizen in a sense, right?  Never

 8   been arrested, to my knowledge, as I recall.

 9            MR. HOSS:  That's correct.

10            THE COURT:  Educated.  Worked at TVA.  There's, I

11   guess, some issue maybe about the circumstances of his firing.

12            MR. HOSS:  That's correct.

13            THE COURT:  And I think the question was, though, is

14   he currently a danger.

15            MR. HOSS:  To--  Correct.  And we had him evaluated

16   yesterday by a private psychologist.

17            THE COURT:  Okay.  That is of great interest to me.

18            MR. HOSS:  Sure.

19            THE COURT:  But I want to see the Social Security

20   paperwork before you get into that.

21            MR. HOSS:  Okay.  Fine.

22            THE COURT:  And Mr. Piper, I think, is maybe still

23   looking at that.  And I'm not -- I'm not trying to cut you off

24   on the certificates.

25            MR. HOSS:  Sure.  I understand.
```

 1          THE COURT:  It's just that this is proof of what you

 2    proffered last time.  Do you want me to put these in the

 3    record, these certificates, as a collective exhibit?

 4          MR. HOSS:  We can, Your Honor.

 5          THE COURT:  All right.  They'll be Collective Exhibit

 6    1 without objection.

 7          (Defendant's Collective Exhibit 1 was received into

 8          evidence.)

 9          (Brief pause.)

10          THE COURT:  Okay.  On the Social Security records, do

11    I have them all?

12          MR. HOSS:  You have the two that we referenced, yes,

13    Your Honor.

14          THE COURT:  All right.

15          MR. HOSS:  That's not all.  That's not all of them,

16    but, yes.

17          THE COURT:  There was a report of a consultive exam.

18    The request for reinstatement of Social Security seems to

19    indicate that he was denied it.

20          MR. HOSS:  He was denied it, he appealed it, and then

21    he got it.

22          THE COURT:  Do you have any documentation of where

23    he --

24          MR. HOSS:  Here is his appeal.  This is his

25    application in response to that last letter from them.

1    That's-- The letter that you have --

2         THE COURT:  I'm really familiar with Social Security.

3         MR. HOSS:  Well, you're --

4         THE COURT:  But what I don't understand is, I thought

5    you were giving me documentation that he was --

6         MR. HOSS:  Awarded.

7         THE COURT:  -- found to be disabled.  And that's not

8    what you've handed me.

9         MR. HOSS:  He was found to be disabled.  That's not

10   what I've handed you, because in the document that shows he was

11   found to be disabled, we don't have any discussion about the

12   personality disorder or the specific mental health conditions

13   that led to that.

14        THE COURT:  So you're proffering that upon his appeal

15   he was awarded both physical and mental disability, combined.

16        MR. HOSS:  He was awarded benefits based upon a

17   combination of factors, and those factors were physical and

18   mental conditions.

19        THE COURT:  And as I indicated to you previously,

20   mental disability is a two-edged sword on a -- in a detention

21   hearing.

22        MR. HOSS:  So is telling the Court about the

23   psychologist who saw your client yesterday, Your Honor.

24        THE COURT:  Yeah.  The reinstatement indicates that

25   although he experienced depression and a personality disorder,

1    he was able to communicate with others, act in his own

2    interest, and perform most ordinary activities.  So if you have

3    any information --

4          MR. HOSS:  We have his response where he addresses

5    all of that, and I can provide that if the Court wants to see

6    that.  Mr. Doggart typed out a response that is extremely

7    detailed.

8          THE COURT:  I'm not asking you to submit it but --

9          MR. HOSS:  Okay.

10         THE COURT:  -- because I'm not going to tell you what

11    you should and shouldn't submit.  And I think maybe -- maybe if

12    you tell me what you want to tell me about the evaluation

13    yesterday, it might answer my questions.

14         MR. HOSS:  Sure.

15         THE COURT:  Do you want this in the record, the

16    Social Security paperwork --

17         MR. HOSS:  We don't have to make that a copy, Your

18    Honor.  We don't have to make that --

19         THE COURT:  -- in the record?

20         Mr. Piper, are you requesting it?

21         MR. PIPER:  (Moving head from side to side.)

22         THE COURT:  All right.  Return that, please.

23         MR. HOSS:  Dr. Kimberly Brown, Your Honor, is a

24    psychologist from Vanderbilt.  We've actually used her in this

25    courthouse before on a CJA case.  The Court mentioned that we

1  were appointed counsel.  We're actually retained counsel in

2  this case.  And Ms. Brown, we retained her to come down and do

3  an evaluation.  All she has done at this point is reviewed some

4  of the discovery materials provided by Mr. Piper and

5  interviewed Mr. Doggart.  It's too soon for her to give a

6  diagnosis.  She is seeking -- and there's quite a bit of mental

7  health records that are still out there from other treating

8  folks here in Chattanooga.  Behavioral Health is one of them.

9  Lee Solomon is another.  But she's waiting to get those

10 additional records.  She is not evaluating him for competency.

11 She is evaluating him to see what -- what conditions led to

12 where he is today.  In essence, she is here for mitigation at

13 sentencing.  That's the purpose that she is involved in this

14 case.  But --

15         THE COURT:  Right.  And for the record, neither side

16 took the position that Mr. Doggart was in any way incompetent.

17         MR. HOSS:  Correct.

18         THE COURT:  Okay.

19         MR. PIPER:  Judge, I'm not sure that's true.  I

20 don't--  I'm not trying to interrupt the Court.  The Court

21 asked me --

22         THE COURT:  Well, Mr. Piper, right.  Let me rephrase

23 it, then.  The Court asked if the government was taking the

24 position that he was incompetent or that he should be

25 evaluated, and you responded that you weren't, the Court could

1    or the defendant could, sua sponte, but that you were not at

2    the time.

3              MR. PIPER:  The Court asked me if I had questions

4    concerning Mr. Doggart's competence, and my answer was yes.

5              THE COURT:  Well, you have not moved for an

6    evaluation --

7              MR. PIPER:  No.  I just --

8              THE COURT:  -- nor have you taken the position that

9    he is incompetent.  Is that correct?

10             MR. PIPER:  That has -- that issue is not before the

11   Court at this point, in my opinion, Your Honor.

12             THE COURT:  It might be, if it was a factor in

13   determining whether or not he can be released on conditions.

14   So, if the government is not prepared at this point to take a

15   position, that's fine.

16             MR. PIPER:  And that's the way I'd prefer to say it,

17   Judge.

18             THE COURT:  That's fine.

19             Go on, Mr. Hoss.

20             MR. HOSS:  So she has essentially interviewed

21   Mr. Doggart.  Her next steps in this case are reviewing the

22   additional medical information and interviewing family members.

23             After she met with him yesterday——I believe they met

24   for over four or five hours, Your Honor——I spoke with her for

25   about 15 minutes, 20 minutes on the phone.  And so what I'm

1  proffering to the court is essentially what our conversation

2  consisted of.  She has a conflict today at 2:00.  I asked if

3  she would be available because I thought the Court may want to

4  call her and talk to her.  But she did have a conflict.  She

5  is available later on in the week if the Court did want to

6  talk to her.  She said that she did not believe that he was

7  any threat of harm to himself.  She said that he at this stage

8  was not a good candidate for in-patient treatment but he is a

9  good candidate for out-patient treatment.

10        When I first went to see Mr. Doggart, the first

11  three or four times that I met with him, Mr. Doggart, the

12  Court will recall, was taking hydrocodone and Xanax, and he

13  was clearly suffering from withdrawals from those two drugs.

14  And these are lawful prescription medications written to him.

15  He was clearly suffering from those withdrawals.  And it was

16  Dr. Brown who told me to notify the jail that he was suffering

17  potentially from tremors, DTs.  And I called the nurse at the

18  jail, informed her of that, and they kind of stepped up their

19  monitoring of Mr. Doggart.

20        As he appears today and as you can talk to him

21  today, it is very different than the first ten days that he

22  was in custody.  And so I think there is a component there of

23  coming off of these medications, of the hydrocodone and the

24  Xanax, but I think that he can be treated on an out-patient

25  basis because of that.  Outside of that, Your Honor, she --

1  she's still preparing her report.  She can't give any opinions

2  about whether he's a threat of harm to the public.  She can't

3  give any opinions about, you know, whether he's a risk of

4  flight and is going to take off going somewhere.  It's way too

5  early to do that.  But as far as whether he's a threat of harm

6  to himself, the answer's no.  As to whether or not she

7  believes he needs in-patient treatment at this juncture, I

8  asked her that directly, and she said no but he would benefit

9  greatly from some type of out- -- out-patient therapy program.

10  So I think there is a combination of conditions that the Court

11  can fashion that gives him that.

12         He is prepared, Your Honor, if the Court thinks it's

13  necessary, to wear an ankle bracelet, obviously to undergo

14  any --

15         THE COURT:  Well, let's finish the proffer --

16         MR. HOSS:  Sure, sure.

17         THE COURT:  -- and then, you know, we'll have time

18  for argument.  Is that the end of your proffer?

19         MR. HOSS:  It is.  That's all I have, Your Honor.

20         THE COURT:  All right.

21         Is the government presenting any additional evidence

22  today?

23         MR. PIPER:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  We'll have argument, unless

25  you want to waive it.

1        MR. HOSS:  Just -- just -- there is a combination of

2    conditions, and Mr. Doggart and I have talked about them

3    extensively.  If the Court were to release him, he would go

4    back to his house, if the Court would allow this, but he would

5    go back to his house on Signal Mountain, where the agents have

6    searched, have recovered any and all weapons that are at his

7    house.

8        THE COURT:  So it's your understanding that the

9    agents confiscated the firearms?

10        MR. HOSS:  They not only confiscated the firearms,

11    even after the fact we made sure they got guns out of another

12    car of his that was left at a different location, but, yes.

13        THE COURT:  And are you proffering to the Court that

14    there's no other weapons available to him in a car, in a home?

15        MR. HOSS:  I'm proffering to the Court the best I can

16    proffer to the Court.  As far as his family, he's got two

17    daughters, Your Honor, and a son-in-law who are present in the

18    courtroom.  They've been inside his house after the FBI agents

19    have been there, and they've searched through his house.  And

20    what they report to me is, there's no weapons remaining in

21    that -- in that house.

22        But he would go back, if the Court believed that an

23    ankle bracelet would be beneficial in this situation,

24    Mr. Doggart has no objection to an ankle bracelet.  He has no

25    objection to a curfew if the Court believed that was

necessary. He has no objection to alcohol and drug counseling

or treatment, and certainly would agree to any mental health

treatment as well. And if he went to -- if he goes to-- For

example, he went to Behavioral Health, where he has a previous

relation to, and they say, "We think you need to go

in-patient," he has no objection to doing that, to following

whatever they require of him in that process. That's what

we'd ask for. Thank you.

THE COURT: Do you want to make argument, Mr. Piper?

MR. PIPER: Briefly, Your Honor. I think Mr. Hoss

has done an excellent job, as always. And I would say, in

Mr. Doggart's favor, he has wonderful family support. And they

-- all of his children have been by him, I think, throughout

the entire time that this case has been pending.

Having said that, Your Honor, it's the government's

position, including the U.S. Attorney's Office and the FBI's,

that Mr. Doggart's threats were very specific and they were

very dangerous. He threatened to kill people. He threatened

to travel to New York. He took affirmative steps in order to

do that, as I think the Court is aware.

THE COURT: Well, and let me just say on that,

because I think Judge Collier has asked for some information

about whether these constitute threats for purposes of entering

a plea, but, you know, for the bill of information and for the

decision I'm making today, the Court certainly recalls the

1    communications that it is that you contend are true threats.

2                MR. PIPER:  (Moving head up and down.)

3                THE COURT:  So I am aware of that, but I'm not --

4    just for everybody to know, I'm not making a decision whether

5    those constitute true threats under the law.  Go on.

6                MR. PIPER:  Thank you, Your Honor.  And we just think

7    that under 3142, that the defendant is, by clear and convincing

8    evidence, a danger to the community.

9                THE COURT:  And you do acknowledge that that's your

10   burden under the bill of information, given that the -- we did

11   have that other issue before.

12               MR. PIPER:  Unquestionably, Your Honor.  And

13   previously when Mr. Hoss and I and Ms. Varnell were in here the

14   last time, I did not rely upon the rebuttable presumption, as

15   the Court may recall.

16               THE COURT:  Yes.  And I noted that in my decision,

17   and noted that the basis for my detaining him at the time was

18   the undefined mental health and drug -- substance abuse issues

19   that I felt needed to be clarified.

20               MR. PIPER:  And to this day, Your Honor, I don't

21   believe those issues have been clarified.  I do believe that

22   the defendant is properly characterized as a danger to the

23   community, based upon these very specific threats.  The actions

24   that the defendant took in order to carry out or at least plan

25   this attack were very specific.  He drove to Nashville.  He

drove to South Carolina, even though he did not see the

gentleman in South Carolina.  The day before he was arrested,

he called him.  It was an intercepted call.  I believe he had

been over to see his daughter and grandchildren near

Greenville, South Carolina, did not meet with the gentleman,

but he did in fact carry firearms with him to South Carolina,

he carried firearms with him to Nashville, to -- and showed

those to the cooperating individual.  He talked about using a

Molotov cocktail.  And worse, Your Honor, he talked about

obtaining some type of destructive device.

THE COURT:  But can you -- can you point me to a

violent or criminal act that he has taken in his past?  I

understand the allegations pertaining to the bill of

information.

MR. PIPER:  Uh-huh.

THE COURT:  I'm asking, does he have any history of

violence towards people of the Muslim faith, or really any

group, that you're aware of?  The pretrial service report seems

to indicate no criminal history whatsoever.  But are you aware

of any -- any actions by him beyond what you've brought to the

Court's attention through the complaint, which now you're

pursuing a portion of in a bill of information; in other words,

any other incident?

MR. PIPER:  Other than the investigation, I have

nothing, Your Honor.  But the investigation is extensive.

1    There were at least 140 pertinent calls, there were Facebook

2    postings --

3              THE COURT:  Right.  I recall all that.

4              MR. PIPER:  -- on and on.

5              THE COURT:  I just wanted to know if you had any

6    evidence of any actions other than as alleged in this current

7    bill of information.

8              MR. PIPER:  I do not, Your Honor.  I will say,

9    though, that the defendant -- whatever was the cause of his

10   mental health issues and his separation from TVA, this has been

11   an ongoing matter for some time.

12             THE COURT:  And his ex-wife seems to indicate he has

13   a drinking problem and that he was maybe drinking when driving

14   or something.  Do you recall that?  I don't recall it having

15   anything at all to do with any kind of threat or -- which is

16   why I'm asking you.

17             MR. PIPER:  No, I don't.

18             THE COURT:  Is there information it related to some

19   kind of threat on --

20             MR. PIPER:  Well, the ex-wife, I think, Your Honor,

21   had relayed information to the FBI, which is one of the reasons

22   the investigation got started.  And I think her concern was

23   that the defendant had become more aggressive in his speech and

24   in his -- and more specific in his goals.  And I think that's

25   the reason why she reached out to the FBI.  And I do believe

1    that's the reason the FBI began investigating, Your Honor, one

2    of the reasons.

3              THE COURT:  Okay.  You heard what Mr. Hoss thought

4    would be appropriate conditions for release.  Do you want to

5    address that, other than that you don't think that he should be

6    released?

7              MR. PIPER:  I do not believe he should be released,

8    Your Honor.  I don't believe there's any condition or

9    combination of conditions which would assure the Court that the

10   defendant is not a danger to the community.  I believe we've

11   carried that by clear and convincing evidence.  It's my hope

12   and goal, and of course this will always be left to somebody

13   wearing a black robe, but that the defendant get some mental

14   health treatment, get his life back in order.  He's got good

15   family support.  I just respectfully submit to the Court that

16   that time is not now, Your Honor.

17             THE COURT:  All right.  Thank you for your argument.

18             MR. HOSS:  Your Honor, may I respond just real

19   briefly?

20             THE COURT:  Yes.

21             MR. HOSS:  I believe in the pretrial services

22   report——and Mr. Piper will correct me if I'm wrong——that the

23   ex-wife said she had no communication with Mr. Doggart for the

24   five years before this, they had literally not spoken with each

25   other for those -- I just don't want the Court to think

1    Mr. Doggart was somehow threatening his ex-wife, because I

2    don't think that's true.

3          THE COURT:  Well, why don't you look at the pretrial

4    service report and point me to the portion you want me to

5    remind myself of.

6          (Brief pause.)

7          THE COURT:  The--  I don't know if you're referring

8    to Page 4, second paragraph, or if it's something else.  I

9    don't--  In Page 4 she says she "heard from other people,"

10   whatever that means.  But is there somewhere in here that she

11   says that she hasn't spoken to him in five years?

12         (Brief pause.)

13         MR. PIPER:  Judge, that is true.  The ex-wife --

14   they've been divorced ten years, and she told the FBI she

15   hasn't spoken to him in five years, she received this

16   information from others.

17         THE COURT:  Which is not defined in the pretrial

18   service report.  And I don't see that five years, but it seems

19   like everybody's in agreement it's been five years.  So that --

20         MR. PIPER:  That -- well, she received the

21   information not five years ago, though, Judge.

22         THE COURT:  Right.  She heard from, quote, "others --

23         MR. PIPER:  Yes, that's correct.

24         THE COURT:  "-- that he takes a lot of painkillers

25   and that his mental stability may be --" actually it doesn't

1    say it; it says, "Mr. Doggart's ex-wife stated that the

2    defendant is an alcoholic, and that his mental stability

3    worsened over the years the more he drank alcohol.  She stated

4    that she also heard from other people that he takes a lot of

5    painkillers."

6              MR. HOSS:  What ex-wives say about ex-husbands five

7    years later, Your Honor, is dangerous territory to base any

8    man's liberty on, but --

9              THE COURT:  Well, I've given both sides an

10   opportunity to present whatever evidence they want me to

11   consider.

12             MR. HOSS:  You have it.  And I think the truth is,

13   Mr. Doggart, Your Honor, was taking his prescribed medications,

14   he was -- and he suffered some serious withdrawals from when

15   those stopped, which probably shows the Court that he was quite

16   dependent on those medications.

17             THE COURT:  Well, exactly what time period are you

18   contending he stopped taking these painkillers?

19             MR. HOSS:  At the Hamilton County Jail when I --

20             THE COURT:  So after all of the recorded

21   conversations?

22             MR. HOSS:  Yes.

23             THE COURT:  You're just trying to explain his

24   appearance at the last proceeding, then.

25             MR. HOSS:  Well, his appearance at the last

proceeding was because the jail had not given him a bath or

anything for well over a week. I don't think he had a bath

until after 10 or 11 days.

THE COURT: I didn't mean his physical appearance. I

meant his excessive note-taking and other actions in the

hearing, which, again, caused me to be concerned about his

mental health well-being. And he does appear to be better

today if by that you mean he appears to be calmer.

MR. HOSS: And in my dealings with him, Your Honor,

he's changed dramatically. But he still needs help. And if

you ask his family, his daughters, his son-in-law, they would

say -- they would ask the Court for alcohol and drug treatment

and mental health treatment.

THE COURT: Are any of them willing to be third-party

custodian of him?

MR. HOSS: I don't know, Your Honor.

THE COURT: Well, we'll take a break. You can ask

them.

MR. HOSS: I can talk to them.

THE COURT: I'll talk to the pretrial service

officer, and we'll reconvene in about five minutes.

MR. HOSS: And by "third-party custodian," you're

asking can he move in with them?

THE COURT: There's two kinds of third-party

custodian. One -- one is a third-party custodian that lives

nearby and is responsible for reporting to the Court any

violations, et cetera.

MR. HOSS:  Sure.

THE COURT:  Sometimes defendants do reside in the

residence with the third-party custodian, and sometimes they

don't.

MR. HOSS:  Sure.

THE COURT:  So I don't -- I don't know what you would

want to proffer to me.

MR. HOSS:  I'll be happy to talk to them.

THE COURT:  I merely was asking you whether any of

the responsible children that you have said support him are

willing to be third-party custodians as a possible condition

that I can consider.

MR. HOSS:  Sure.

MR. PIPER:  Judge, I hope that the Court is not

relying solely on the ex-wife's statements to the FBI.  We have

a report on that, and I can't remember whether Agent Smith

specifically addressed it.  We had a lengthy hearing last time

on the probable cause and detention hearing aspects of this

case, pursuant to the complaint and warrant.  What the ex-wife

said was that she had received information from the others that

the defendant was in fact, in her opinion, more dangerous.  She

did agree that she hadn't spoken to him in five years and they

had been divorced for ten years.  But that's not really the

1    issue, respectfully, Your Honor.  The issue is that when Agent

2    Smith testified, there were a number of areas he addressed with

3    respect to the defendant's --

4              THE COURT:  I agree.  And I don't need to rehear

5    argument on that.

6              MR. PIPER:  Okay.  Okay.

7              THE COURT:  All right?  We'll take the break.

8              MR. HOSS:  Thank you, Your Honor.

9              THE COURT:  And should five minutes be enough?

10             MR. HOSS:  It should.  Absolutely.

11             THE COURT:  All right.  And, Ms. Zwicknagel, I'll see

12   you in chambers, please.

13             (Brief recess.)

14             MR. HOSS:  May I, Your Honor?

15             THE COURT:  Yes.

16             MR. HOSS:  Your Honor, his two daughters, the two

17   that are present today, are Christy Adkins, and she lives in

18   Hixson, Tennessee, with -- she is present with her husband.

19   She has two kids.  And then Terry Lee, also present today.  She

20   also has two kids.  And they are both willing to step in as

21   third-party -- as third-party assistants.

22             THE COURT:  It's called third-party custodian.  He

23   doesn't have to live with them for them to be legally

24   responsible as a third-party custodian.  Hopefully you

25   explained to them that to be a third-party custodian you agree

 1   to supervise the defendant, to use every effort to assure the

 2   defendant's appearance at all court proceedings, and to notify

 3   the Court immediately if the defendant violates a condition of

 4   release.

 5          MR. HOSS:  I did.  And we went through some specific

 6   scenarios, even.  They live approximately 20--  Ms. Adkins

 7   lives 20, 25 minutes away from his residence.  Ms. Lee lives

 8   about 30, 35 minutes away from his residence.  Ms. Lee works

 9   full time at Unum.  Ms. Adkins does not work.  So I think they

10   would alternate checking in on him on a regular basis.  But

11   they're both willing to do that.

12          THE COURT:  All right.  And what's -- what's the full

13   name again?

14          MR. HOSS:  Sure.  It's Christy Adkins, A-D as in dog,

15   K-I-N-S.

16          THE COURT:  How do you spell Christy?

17          MR. HOSS:  C-H-R-I-S-T-Y.

18          THE COURT:  Okay.  And who?

19          MR. HOSS:  And then Terry Lee, T-E-R-R-Y, and just

20   L-E-E, also of Hixson.  And if the Court needs their

21   residential addresses, I have those.

22          THE COURT:  They're both in the Chattanooga,

23   Tennessee area, right?

24          MR. HOSS:  Hixson, Tennessee.  37343 area code.

25          THE COURT:  Okay.

1          (Brief pause.)

2          THE COURT:  The Court, I guess, is--  The Court is of

3    the belief that there's not clear and convincing evidence that

4    he's a danger that can't be assessed through appropriate

5    conditions.  So I intend to release Mr. Doggart on conditions.

6          MR. PIPER:  Judge, may I--  Would the Court give me

7    one opportunity to argue this again, please?

8          THE COURT:  No.  We've had argument.

9          MR. PIPER:  All right.  Would I -- may I ask the

10   Court to stay the Court's order so I can appeal this to the

11   district court?

12         THE COURT:  You can ask that, but I'm -- I'm going to

13   deny it.

14         MR. PIPER:  Your Honor.

15         (Brief pause.)

16         THE COURT:  But you can appeal immediately.  You

17   can --

18         MR. PIPER:  I understand that.  But I can't write it

19   immediately.  May I ask the Court to stay it pending the close

20   of business today, at least?

21         THE COURT:  Well, I don't think that he can be

22   released until the electronic monitoring's in place, which

23   won't be for -- how long?

24         MS. ZWICKNAGEL:  Your Honor, Officer Lindsey's out

25   this week, but we do have another officer who can do electronic

```
 1    monitoring.  I'm not sure of her availability right now this
 2    week.
 3              THE COURT:  Why don't you find out.
 4              But it's my understanding it's going to take a day
 5    or two to get the electronic monitoring set up, which should
 6    give you plenty of time.
 7              Ms. Zwicknagel, if you'll go find out the soonest
 8    available connection to electronic monitoring.
 9              MS. ZWICKNAGEL:  Yes, Your Honor.
10              (Brief pause.)
11              THE COURT:  While we're waiting for that, on the
12    issue of waiver of an indictment, given Judge Collier's order,
13    I was not going to have Mr. Doggart waive indictment today.  I
14    think that can be addressed at a later time.  But I frankly
15    just have not been able to have any conversations with Judge
16    Collier about whether he wants the waiver of indictment
17    addressed before the change of plea hearing.  Did either of you
18    get any direction on that when you --
19              MR. PIPER:  No, Your Honor.
20              THE COURT:  Did you just get--  You got an order?
21              MR. PIPER:  That's all we got, Judge.
22              THE COURT:  All right.  What is you-all's position on
23    waiver of indictment at this point?
24              MR. HOSS:  I would -- I would agree with the Court,
25    hold off until the judge rules on the plea agreement.
```

         1          MR. PIPER:  The plea agreement has a provision in it,

         2    Your Honor, stating that the defendant is specifically waiving

         3    the right to be indicted within the time frame specified within

         4    18 U.S.C. Section 3161.

         5          THE COURT:  Is the briefing--  I guess I just want to

         6    understand the schedule.  So affirmatively for the record

         7    you're not asking to address the waiver of indictment at

         8    this -- at this point, correct?

         9          MR. HOSS:  That's correct.  That's correct.

        10          THE COURT:  And it sounds to me like it is within the

        11    contemplation of the plea agreement that that be done typically

        12    at the same time that he would be entering his plea.  So it

        13    sounds like it's better to wait and not have the waiver of

        14    indictment today.

        15          MR. HOSS:  I agree, Your Honor.

        16          MR. PIPER:  That's correct, Judge.

        17          THE COURT:  Okay.  Mr. Piper, you might want to get a

        18    copy of the transcripts from both hearings, with respect to

        19    your appeal as well, although you don't have to have that to go

        20    forward.

        21          MR. PIPER:  I understand that, Your Honor.  Your

        22    Honor, can Your Honor give me one minute to make one quick

        23    argument on this, please?

        24          THE COURT:  On -- on the stay?

        25          MR. PIPER:  No, on the detention issue.

1      THE COURT:  I feel like I've -- I've made my ruling

2   and you're wanting to -- to reopen the argument after we have

3   closed argument on that.  I'll hear you on the stay.

4      MR. PIPER:  No, it's about -- it's about the

5   detention, Judge.  And if the Court doesn't want me to argue,

6   that's fine, but...  (Indicating.)

7      THE COURT:  Is it something you didn't argue before?

8      MR. PIPER:  Well, Your Honor, it's only that the--

9   If the Court will not allow me to argue, that's fine, I'm going

10  to sit down and shut up.

11     THE COURT:  I'm going to let you make your record.

12  All right?

13     MR. PIPER:  Okay.

14     THE COURT:  And Mr. Hoss is not objecting to your

15  making your post-ruling argument.

16     MR. PIPER:  Judge, we have a complaint and warrant

17  and an affidavit in support of that in place.  We had Agent

18  Smith's testimony, which was lengthy.  The direct and

19  cross-examination were both lengthy.  We set out all these

20  variables.  After that happened, after the Court found there

21  was probable cause to -- I think probable cause was waived.

22  The Court found that the defendant should be detained based

23  upon dangerousness to the community.  Since that's happened,

24  the defendant has at least tacitly agreed that he has committed

25  an 875(c), an interstate communication of threats.  We have a

plea agreement that's signed, that's in the record, where the

defendant is agreeing that he has committed these acts and in

fact that they are, quote, "true threats." That is in fact in

the plea agreement. I would think that would inure to the

government's advantage as far as the detention issue is

concerned, that before the defendant was not acquiescing to

anything; after the detention hearing and preliminary hearing,

the defendant is now agreeing——at least his signature appears

on a plea agreement——that he has committed these acts. Two and

a half pages of factual bases are contained in that plea

agreement, Judge.

        The FBI -- and I know the Court doesn't make its

decisions based upon what the FBI does or believes, but the

FBI had -- and this came out at the hearing, that they had

round-the-clock surveillance on the defendant, physical

surveillance, in addition to electronic surveillance, in

addition to the Title III wiretap. I believe, respectfully,

Your Honor, that the position for the government is much

stronger now than it was at the detention hearing when the

Court originally detained the defendant.

        THE COURT: And the Court noted in the order that it

was the undefined -- based on the continuing nature of the

offense shown by the proof and the evidence of undefined but

potentially disabling mental health issues and evidence of

substance abuse issues that -- that concerned the Court. And I

think that I have conditions now that he can be released on.
And he hasn't-- I understand that he's signed an agreement.
He has not entered a plea. Let me ask you this: Is he subject
to mandatory detention upon entering a plea?

MR. PIPER: I don't believe so, Your Honor, no.

THE COURT: Anyhow, what did you find out,
Ms. Zwicknagel?

MS. ZWICKNAGEL: Your Honor, we need to find out if
he has features on his telephone. If he has a land line
telephone, there needs to be no features. If there are no
features, they could do it by Friday.

THE COURT: By Friday?

MS. ZWICKNAGEL: Yes, Your Honor.

THE COURT: Mr. Hoss?

MR. HOSS: He has no land line telephone, Your Honor.

THE COURT: He would have to get one.

MS. ZWICKNAGEL: Not --

MR. HOSS: Yes, Your Honor.

THE COURT: He can't be released until he has one.
So somebody would have to take care of getting him one, and it
has to be with no features, and then it would have to be hooked
up.

MS. ATKINS: That's fine.

THE COURT: Which the earliest it sounds like it can
be done is by Friday.

1    MR. HOSS:  They can do that.

2    THE COURT:  Maybe they can.  Maybe they can't.  And

3    you're at the mercy of the telephone company for a land line.

4    MR. HOSS:  Sure.

5    THE COURT:  So he won't be released until it's in

6    place.

7    MR. HOSS:  I understand.  I understand.

8    THE COURT:  So it's not going to affect the Court's

9    ruling.  It gives Mr. Piper more time to get a stay from the

10   district judge or -- or get a ruling from the district judge if

11   he appeals my decision.  And it sounds like he will.  So, you

12   know, he can pursue either one of those alternative courses of

13   action.

14   MR. HOSS:  No, I understand that, Your Honor.  And

15   just for purpose of the record, what are the combination of

16   conditions besides --

17   THE COURT:  Oh, I'm going to give those all to him.

18   MR. HOSS:  Okay.  Okay.

19   THE COURT:  Mr. Doggart, stand up, please.  Do you

20   understand that you're under oath?

21   THE DEFENDANT:  Yes, ma'am.

22   THE COURT:  What I'm going to be doing is giving you

23   conditions of release.  Your daughters are going to be

24   responsible as custodians.  I am going to ask both of them to

25   act as your custodians.  Not only will you be putting yourself

1  in a terrible position if you violate any of the conditions

2  that I set, you'll be putting your daughters in a bad position

3  as well.  The conditions that are going to apply are that you

4  must not violate any law while you're on release.  Things that

5  would not normally bring you into federal court now will bring

6  you into federal court.  So that means no federal, state, or

7  local law may be violated.

8          Now, as I -- as I go over these conditions, you're

9  going to have an opportunity to hear them, to understand them.

10  Your lawyer will have a chance to challenge them.  But what

11  you're not going to really have a chance to do is to come back

12  and tell me you didn't understand what I required.  So make

13  sure that you do understand everything I'm telling you.

14  You'll have to cooperate in DNA sampling.

15          You'll have to advise the Court if you have any

16  change in either your residence or your telephone number,

17  because we'll be depending on you living there and being

18  reachable by phone.  You of course will need to stay in

19  contact with your lawyers so that they can advise you of any

20  dates where you need to be present in court.  Right now I

21  can't give you a date when you might next appear, because I

22  don't have any dates to give you.  And the next time you are

23  going to be required to appear may very well be when Mr. Piper

24  has a hearing, if he gets one, on any sort of appeal.  So stay

25  in contact with your lawyers.  You of course also have to

1    agree that you're going to surrender for any sentence.  You

2    will have to execute a 30,000-dollar bond.  That means that

3    you'll forfeit that money if you do not comply with the

4    conditions of your bond.

5              I need Ms. Adkins and Ms. Lee to come forward now.

6              (Brief pause.)

7              THE COURT:  You'll need to raise your hands.  You'll

8    be sworn in.

9              (The witnesses were duly sworn.)

10             THE COURT:  Each of you has offered to serve as the

11   custodian of your father.  Is that correct?

12             MS. ATKINS:  Yes, ma'am.

13             MS LEE:  Yes.

14             THE COURT:  And do you understand what that requires?

15             MS. ATKINS:  Yes.

16             MS LEE:  Yes.

17             THE COURT:  In addition to verbally stating that,

18   you'll be required to sign this order where I'm setting these

19   conditions of release.  You'll see that you'll need to provide

20   your phone numbers on the line --

21             MS. ATKINS:  (Moving head up and down.)

22             MS LEE:  (Moving head up and down.)

23             THE COURT:  -- and your address.  You can just put

24   city and state for your address, but put your phone numbers

25   down.  And what you're agreeing to is to supervise your

1    father --

2              MS LEE:  (Moving head up and down.)

3              THE COURT:  -- to use every effort to assure his

4    appearance at all court proceedings, and to notify the Court

5    immediately if he violates any of the conditions that I'm

6    setting.  Are you--  First of all, do you understand that duty?

7              MS. ATKINS:  Yes.

8              MS LEE:  Yes.

9              THE COURT:  And do you understand how hard it would

10   be, that if you found out he has violated a condition of

11   release, that you would have to make that phone call, knowing

12   that it might result in him being placed into custody?

13             MS. ATKINS:  Yes.

14             MS LEE:  Yes.

15             THE COURT:  And are you willing to do that?

16             MS. ATKINS:  Yes.

17             MS LEE:  Yes, ma'am.

18             THE COURT:  All right.  If you have any questions

19   about any of the conditions I'm setting, you need to let me

20   know that as well.

21             Mr. Doggart, you'll be reporting to Probation

22   Officer Candace Lindsey.  I have a phone number here for you

23   to report to her.  You'll be meeting with Ms. Zwicknagel

24   before you--  You may not need to meet with her today.  She'll

25   probably give you some reporting instructions.  But in all

1   likelihood you won't be released until, the earliest, on

2   Friday.  You'll have to surrender your passport to Ms. Lindsey

3   within the time frame.  You can't get another passport.  You

4   cannot travel outside the Eastern District of Tennessee.  That

5   means you can't go to Georgia, you can't go to Alabama, you

6   can't go to Nashville.  You need to figure out with Mr. Hoss

7   what the boundaries are for the Eastern District of Tennessee,

8   and you need to stay within them at all times.

9           In addition, you have to avoid all contact, directly

10  or indirectly, with any person who may be a victim or a

11  potential witness in this prosecution.  That means any of the

12  people in--  I can't remember the name of the militia.

13  Quad- -- I don't know how it was described.  It was described

14  variously.  What's the name of the --

15          MR. PIPER:  Islamberg, Your Honor?

16          THE COURT:  No, the --

17          MR. HOSS:  OAF?

18          THE COURT:  -- chat group.

19          MR. HOSS:  OAF.

20          MR. PIPER:  Oh, it's the American Reapers.

21          THE COURT:  American Reapers?

22          MR. PIPER:  Yes.

23          MR. HOSS:  Or OAF?

24          SPECIAL AGENT SMITH:  Or OAF.  There's --

25          THE COURT:  Anyhow, my point being, you can't have

contact with any of that chat group.  In fact, I'm going to
restrict you from the Internet.

        MR. HOSS:  I think that's better, Your Honor.

        THE COURT:  There will be no Internet access.

        THE DEFENDANT:  Right.

        THE COURT:  There will be no opportunity for you to
travel to Nashville or Kentucky or any -- Texas, any of the
other places that you are factually involved in.  All right?

        THE DEFENDANT:  (Moving head up and down.)

        THE COURT:  Basically you're going to end up being
restricted to your house.  Now, if you talk to them on the
telephone, that's a violation.

        THE DEFENDANT:  (Moving head up and down.)

        THE COURT:  If you write some of these people a
letter, that's a violation.  If you send them a carrier pigeon,
that's a violation.  No contact, direct or indirect.  That
means you can't do through a friend what you can't do yourself.

        You're going to have to undergo psychiatric
treatment as determined by the probation office.  I'm not sure
that your current mitigation expert is -- is at all
sufficient.  That doesn't sound like treatment to me.  So the
probation office has a relationship with Joe Johnson and some
other providers that I expect that you'll be required to meet
with.  But you are going to have to undergo psychiatric
treatment.  And of course no guns, destructive device, or

1    other dangerous weapons.

2            Ms. Adkins and Ms. Lee, it was represented that you

3    have been through the house and there are no guns in the house

4    and the cars.  Is that correct?

5            MS LEE:  That's correct.

6            MS. ATKINS:  That's correct.

7            THE COURT:  Are you aware of any other place that

8    your father would store any weapons?

9            MS. ATKINS:  No.

10           MS LEE:  No.

11           THE COURT:  All right.  Mr. Doggart, you know this is

12   uncomfortable, I'm sure, for your daughters, because they've

13   become the parent—all right?—in terms of supervision.  You

14   can't have any guns.  That's on -- you know, that's on you.

15           THE DEFENDANT:  Yes, ma'am.

16           THE COURT:  No alcohol.  Zero.  None.  So if there's

17   any in the house, I expect your daughters to get it out of

18   there for you before Friday.

19           MS. ATKINS:  Okay.

20           THE COURT:  You can't unlawfully possess or use any

21   kind of narcotic drug or controlled substance unless it's

22   prescribed to you.  Now, you take some pain medications.

23   You'll be able to continue taking them, only as prescribed.

24   The probation office will be responsible for making sure that

25   you are taking your medicine as prescribed.

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  That means you can't take somebody else's

3  prescription.

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  You'll be subjected to testing.  You'll

6  have to participate in a program of substance abuse and

7  treatment as well.  I believe that can be done in conjunction

8  with your mental health treatment.  And because of various

9  releases that are needed and -- and information, that, again,

10  suggests to me that you may be seeing a new mental health

11  person that the probation office recommends, as opposed to an

12  old person, but -- and by "old," I mean your old doctors.  You

13  can see both if you want to, if they'll do that.

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  But you're going to have to do what

16  Probation says in terms of your mental health treatment.  Also,

17  you're going to have electronic monitoring and home detention.

18  Now, what that means is, you're restricted to your residence at

19  all times except for approved activities.  And the way this is

20  worded, I guess somebody could make an argument that they

21  thought it was approved because it's listed here.  So I want to

22  be crystal clear with you.  There are certain things that the

23  probation office will approve; for instance, medical or

24  substance abuse or mental health treatment, but you have to get

25  that preapproved, too.  Attorney's visits, they have to know

before you go that you're going.  And you might be approved for
religious services——I've listed it here——but only if you can
demonstrate that that's something you were already doing
regularly.  So it's not an excuse to start going places.  It's
basically home confinement, except for I will allow you to
visit your doctors and your lawyers as long as the probation
office gives you preapproval.  So that's location monitoring.
You're going to have to pay for -- you're going to have to have
the phone line in place in order for it to take place.  You'll
have to pay for that as well.  And you won't be released until
that monitoring is set up.

You'll have to report if you have any contact with
law enforcement.  That would include any arrests, questioning,
or traffic stop, and even if you don't get a ticket.  Now,
that should be pretty easy for you, because you should either
be at home or in a straight line driving to your doctor's
visit or your lawyer——all right?——or on the way back.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  In other words, there shouldn't be a lot
of opportunity for you to actually have contact with law
enforcement.  But if -- on the off chance that you do, you have
to report that immediately.

You cannot enter into any agreement to act as an
informer or a special agent for the government without the
express permission of the Court.  Your lawyers and the

government's lawyers are very familiar with how that process

works, and basically you can't try to help yourself by helping

the government unless you have the permission of the Court to

do that.  You'll have to truthfully answer the inquiries of

the probation officer and follow their directions.  And I've

already said this, but you'll have no Internet access by any

device.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Now, do you understand all of these

conditions?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  If you violate any of the conditions of

release, then that can result in the immediate issuance of a

warrant for your arrest, revocation of your release, an order

of detention, forfeiture of your -- of the bond, prosecution

for contempt of court.  Of course your daughters could be

prosecuted for contempt of court as well if they don't fulfill

their custodial duties.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  So you're not just jeopardizing yourself

if you do breach these conditions.  If while you're on release

you commit a federal felony, the offense punishment is very

severe.  If you commit a federal felony while you're on

release, that would stack on top of any sentence you get, up to

ten years.  And if you commit a federal misdemeanor, that will

1  stack up to one year.

2        It's also a crime for you to obstruct a criminal

3  investigation in any way.  So any attempt by you to tamper

4  with a witness, a victim, or informant, in addition to

5  violating the conditions of your release, could result in a

6  250,000-dollar fine and 10 years in jail.  And then if after

7  your release you don't appear or you don't surrender for any

8  sentence, same punishment.

9        The paperwork I've got here has much more detail

10  about the potential punishments or sanctions, penalties, if

11  you don't comply.  So you'll want to go over that with your

12  lawyer.  It also has more information about the conditions

13  that you can read about in more detail.

14        Ms. Adkins and Ms. Lee, do you understand the

15  conditions that are being imposed?

16        MS. ATKINS:  Yes.

17        MS LEE:  Yes, ma'am.

18        THE COURT:  All right.  You'll see on this first page

19  where you have to fill in your address, your phone numbers, and

20  you should both sign there.  There is only one line right now,

21  but you just both sign and date it.

22        MS LEE:  (Moving head up and down.)

23        THE COURT:  Assuming that they are willing to do that

24  still, after reading this and understanding the sanctions if

25  they fail to comply, you can sign as well, which you'll need to

sign where it's marked here and on the bond.  You'll see that

your signature place is marked.  And then assuming that all of

that's done, I'm going to order you released after processing,

upon notice by the probation office that monitoring's in place.

        (Brief pause.)

        THE COURT:  That way you don't have to come back

here.  What will happen is, Mr. Hoss will let the probation

office know; the probation -- when the land line's available.

Once the land line's available, the probation office can

schedule installation of the equipment, and then you can be

released.  It takes time.  It's not something that's going to

happen in a matter of hours.  And I don't know -- you know,

depending on what happens on up the chain, who knows what will

happen, but my intent is that once the probation office

confirms that the monitoring is in place, that the marshals

will be able to provide appropriate word to -- I think you're

at Silverdale maybe?  Maybe not.

        MR. HOSS:  Jail.

        THE COURT:  Okay.  Anyhow, so you be released.

        THE DEFENDANT:  Yes, ma'am.

        THE COURT:  Here's the paperwork for you to review.

        (Brief pause.)

        MR. HOSS:  May we sit down, Your Honor?

        THE COURT:  Yes.  And Ms. Adkins and Ms. Lee, you'll

have to go over there with Mr. Hoss.  Stay over on this side,

1    by the chairs, and he can show you the paperwork and where you

2    should sign it.

3              (Brief pause.)

4              THE COURT:  Do you need to make a correction for the

5    record?

6              MR. HOSS:  I do.  It's Christy Atkins, A-T as in Tom,

7    K-I-N-S.  And then Terri, T-E-R-R-I, not Y, Lee.  So I was oh

8    for two, Your Honor.  Did the Court want me to put each of

9    their addresses right underneath their name?

10             THE COURT:  Just the state and the city and their

11   phone numbers.

12             (Off-the-record discussion.)

13             THE COURT:  Mr. Doggart, stand back up, please.

14             THE DEFENDANT:  Okay.  (Complying.)

15             THE COURT:  Is this your signature on the paperwork?

16             THE DEFENDANT:  Yes, ma'am.

17             THE COURT:  Does that mean that you understood the

18   conditions, you understand the consequences, and you're giving

19   your word to the Court that you're going to comply by them?

20             THE DEFENDANT:  I am, Your Honor.

21             THE COURT:  Now, where I see people mess up on these

22   types of conditions are twofold; one, they think they're smart

23   enough to outfox the probation office and use the Internet.

24   The other type is where they don't really understand what that

25   means.  It means you can't pay your bills via the Internet if

that's what you've been doing, you can't Facebook, you can't --
you can't read e-mail.  I mean, you have to stay off the
computer.  So I don't want you to be tripped up on what it
means.  To the extent you think you can outfox the probation
office on it, you know, many have tried.

        THE DEFENDANT:  Yes, ma'am.

        THE COURT:  I don't know how many have failed, but a
lot of them, because I see them.

        THE DEFENDANT:  Yes, ma'am.

        THE COURT:  So do you understand what that
restriction is and how -- how broad it is?

        THE DEFENDANT:  I do, Your Honor.  I will stay off
the Internet.

        THE COURT:  All right.  I'm going to get you a copy
of this paperwork, as well as your daughters, so they'll know
what's required.  And do you understand that, you know, come
Friday you may or may not be released.  It depends, first, on
whether this monitoring's in place and, second, whether or not
Mr. Piper has obtained any order that might prevent that.

        THE DEFENDANT:  Yes, ma'am.

        THE COURT:  So that'll be in flux, at least from what
I can tell right now.

        THE DEFENDANT:  Yes, ma'am.

        THE COURT:  All right.  Is there anything else we
need to address on the detention issue before we move on to the

1    remaining issue?

2              MR. HOSS:  May the daughters have a copy of that as

3    well, Your Honor?

4              THE COURT:  Yes.  They'll be getting a copy of it.

5    They're bound by it.  Oh, and you corrected the spelling of

6    their names on the record.  Is that right?

7              MR. HOSS:  I did.

8              THE COURT:  You can sit back down, Mr. Doggart, on

9    this.

10             THE DEFENDANT:  Thank you.

11             THE COURT:  Anything else on the remaining issue?

12             MS. ATKINS:  No.

13             MS LEE:  No.

14             THE COURT:  Given that this is a public hearing, I

15   think it would be best to proceed by way of written submissions

16   for the reasons that this case should remain sealed.  I

17   understand that the defendant doesn't object and isn't taking a

18   position on it, so I don't need any brief from them, I don't

19   think.

20             MR. PIPER:  Judge, we'll move to unseal, then.

21             THE COURT:  It's up to you.

22             MR. PIPER:  No.  That's fine.

23             THE COURT:  The government's moved to unseal.  Do you

24   have any objection to that?

25             MR. HOSS:  No position, Your Honor.

1        THE COURT:  All right.  Then the file will be

2   unsealed.

3        Anything further?

4        MR. PIPER:  No, Your Honor.

5        MR. HOSS:  No.

6        THE COURT:  All right.  That will conclude this

7   matter.

8                         END OF PROCEEDINGS

9

10

11        I, Elizabeth B. Coffey, do hereby certify that I

12   reported in machine shorthand the proceedings in the

13   above-styled cause, and that this transcript is an accurate

14   record of said proceedings.

15

16

17                              s/Elizabeth B. Coffey
                                Elizabeth B. Coffey,
18                              Official Court Reporter

19

20

21

22

23

24

25